# PART ONE

Ladies and Gentlemen:

Let me thank you at the outset, as counsel have already done, for the attention which you have paid to the lawyers and the witnesses in the case and to all the evidence that has been introduced. I also want to thank you for your patience in enduring the occasional delays and hearings outside of your presence which are inevitable in any case.

My instructions to you are organized into three parts. The first part deals with civil cases generally. The second to the law applicable to the specific claims asserted in this case; and the third (and shortest) to the mechanics and procedure of your deliberations.

As you know, the functions of the Judge and of the Jury in a case of this sort are quite different from one another. It is my duty as Judge to instruct you as to the law which applies to the case. It is your duty to decide the facts and, in deciding these facts, to comply with the rules of law and apply them as I state them to you without regard to what you think the law is or should be. In deciding the facts and issues of fact, you must decide them without prejudice, or bias, or sympathy. Corporations stand equal before the law and are entitled to the same treatment as are individuals under the law.

If during the course of these instructions I state any rule, direction or idea in varying ways, no emphasis is intended by me and none must be inferred by you. You are not to single out any certain sentence or individual point or instruction and ignore the others. Rather, you are to consider all of my instructions as a whole, and you are to regard each instruction in the light of all others.

You and only you are the judges of the facts. If any expression of mine or anything I may or may not have done or said would seem to indicate any opinion relating to any factual matter, I instruct you to disregard it.

During their arguments counsel have referred to some of the evidence. In deciding the facts you may consider not only the evidence referred to by counsel but any which you may believe to be material.

If any reference by counsel to matters of evidence does not coincide with your own recollection, it is your recollection which is to control during your deliberations.

You are to consider only the evidence in the case. But in your consideration of the evidence you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw, from facts which you find have been proved, such reasonable inferences as seem justified in the light of your own experience.

The statements and arguments of counsel and questions which they ask which contain assertions of fact are not evidence and should not be considered as evidence unless any such statement was made as a stipulation conceding the existence of a fact or facts. When the attorneys on both sides stipulate or agree as to the existence of a fact, you should consider that fact as you do all other evidence in the case.

At times throughout the trial I have been called upon to pass on the admissibility of certain offered evidence. You should not be concerned with my rulings or the reasons for them. Whether evidence which has been offered is admissible or is not admissible is purely a question of law, and from a ruling on such a question you are not to draw any inference. In admitting evidence, to which an objection has been made, the court does not determine what weight should

be given to such evidence. You must not guess what the answer might have been to any question to which an objection was sustained, and you must not speculate as to the reason the question was asked or the reason for the objection. Every party has the right to object to any evidence, to obtain from the court the legal opinion of the court as to whether such evidence is admissible, and, if admissible, for what purposes and to what extent. You are not to infer that any objection to evidence had any other purpose. Any evidence as to which an objection was sustained by the court, and any evidence which I have ordered stricken, must be entirely disregarded.

There are two types of evidence from which a jury may properly decide what the facts are. One is direct evidence -- such as the testimony of an eyewitness. The other is circumstantial evidence -- the proof of a chain of circumstances pointing to the existence or non-existence of certain facts. As a general rule, the law makes no distinction between direct and circumstantial evidence.

The burden is on the plaintiff in a civil action, such as this, to prove every essential element of each of his/her claims by a preponderance of the evidence. If the proof should fail to establish any essential element of any one of the plaintiff's claims by a preponderance of the evidence, you should find for the defendant as to that claim.

To "establish by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a preponderance of the evidence in the case means such evidence as, when considered and compared with that opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true.

3

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You should carefully scrutinize the testimony given by each witness and the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness' intelligence, motive and state of mind, and his/her demeanor and manner while on the stand. Consider also any relation each witness may bear to either side of the case; whether a witness has demonstrated any bias, prejudice or hostility toward a party; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. Two or more persons witnessing an incident may see or hear it differently, and innocent misrecollection, like failure of recollection, is not an uncommon experience.

A witness may be discredited or impeached, not only by contradictory evidence, but also by evidence that at other times the witness has made statements which are inconsistent with his/her present testimony. Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of differing witnesses, should be considered by you, but, in weighing their effect, you should consider whether the inconsistencies or discrepancies pertain to a matter of

importance or an unimportant detail, and whether you believe the discrepancy or inconsistency results from innocent error or willful falsehood.

After you have considered all of the factors bearing upon the credibility of a witness which I have mentioned to you, you may conclude to reject all of the testimony of a particular witness, none of the testimony of a particular witness, or part of the testimony of a particular witness. In other words, you may give the testimony of any witness such credibility, if any, as you may think it deserves.

During the trial of this case, certain testimony has been read to you, or shown to you by video by way of deposition, consisting of sworn recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys for the parties to the case. The testimony of a witness who, for some reason, cannot be present to testify from the witness stand may be presented in writing under oath, in the form of a deposition. Such testimony is entitled to the same consideration, and is to be judged as to credibility, and weighed, and otherwise considered by the jury, in so far as possible, in the same way as if the witness had been present, and had testified from the witness stand.

In this case you have heard what is called expert testimony.

A witness who by education and experience has become an expert in any art, science, profession, or calling may be permitted to state his/her opinion as to a matter in which he is versed and which is material to this case. He may also state the reasons for such opinions.

You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves, and you may reject it entirely if you conclude that the reasons given in support of the opinion are unsound. If you find that the facts upon which a

5

particular expert relied are not sufficient to support the opinion or that the facts relied upon are erroneous, you may reject the opinion.

## PART TWO

Let me now instruct you on the law specifically applicable to this case.

This case is brought under section 2 of the Sherman Act. The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

It is undisputed that during the period that Novell owned WordPerfect and Quattro Pro (1994 to 1996), Microsoft had a monopoly in the PC operating systems market. Monopoly power is the power to control prices or exclude competition.

Novell claims that Microsoft injured Novell by engaging in anticompetitive conduct directed against it. Specifically, Novell alleges that, in violation of section 2 of the Sherman Act, Microsoft damaged its office productivity applications (WordPerfect, Quattro Pro and PerfectOffice) by withdrawing support for the namespace extension application programming interfaces (APIs) to preserve Microsoft's monopoly in the PC operating systems market. Because neither PerfectOffice nor WordPerfect nor Quattro Pro was a PC operating system, this claim may require a little more explanation. Novell presents two theories that underlie it. First, Novell contends that its office productivity applications were "cross-platform" software of such importance that their ability to run on other, non-Microsoft operating systems posed a threat to Microsoft's monopoly in the market for PC operating systems. Specifically, Novell says that the availability of WordPerfect, Quattro Pro, and PerfectOffice on non-Microsoft operating systems would have substantially reduced the dominance of Microsoft's PC operating systems. Second, Novell contends that PerfectOffice, WordPerfect, and Quattro Pro, including technologies called AppWare and OpenDoc, represented a form of "middleware" that threatened the applications barrier to entry that protected Microsoft's monopoly in the market for PC operating systems.

Therefore, according to Novell, Microsoft purposely harmed Novell's office productivity applications in order to protect its monopoly in the PC operating system market.

Although, as I have just stated, Novell claims that Microsoft engaged in anticompetitive conduct against its office productivity applications in order to maintain its monopoly in the PC operating system market, Novell is not claiming that Microsoft attempted to monopolize the productivity applications market itself, i.e., the market in which Novell's PerfectOffice, WordPerfect, and Quattro Pro and Microsoft's Office, Word, and Excel were direct competitors.

In order to prevail, Novell must prove by a preponderance of the evidence that Microsoft unlawfully maintained its monopoly power in the PC operating system market by engaging in anticompetitive conduct directed at Novell's office productivity applications. Anticompetitive conduct is conduct, other than competition on the merits, that has the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers in the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals — or the achievement of these goals — unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Microsoft's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors. You should consider whether Microsoft had legitimate business reasons for withdrawing support for the namespace extension

APIs. You should also distinguish maintenance of monopoly power through anticompetitive acts from the maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, which are not unlawful. You should consider all the characteristics of the relevant market and evaluate Microsoft's conduct as a whole.

Antitrust law does not impose a general duty upon a monopolist to cooperate with a competitor or to share its intellectual property with a competitor, even if the innovations or intellectual property might be useful to the competitor in developing its products. However, intellectual property rights do not confer a privilege to violate the antitrust laws, and, under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct, such as when a monopolist has ended a voluntary (and thus presumably profitable) course of dealing, or when a monopolist has engaged in deceptive conduct, reasonably relied upon by a competitor, that has the purpose and effect of preventing a competitor from developing in a timely manner a product that would enhance competition by threatening a monopolist's monopoly power in the relevant market, here the PC operating system market.

Anticompetitive intent is not alone sufficient to establish a violation of the antitrust laws. While intent is not necessary to prove a violation of section 2 of the Sherman Act, it is not irrelevant to whether a violation occurred. You may consider Microsoft's intent in order to understand the likely effect of its conduct and to evaluate whether Microsoft's conduct was competition on the merits and whether the conduct harmed competition in the PC operating system market.

In order to prevail, Novell must also prove that the anticompetitive conduct it alleges was engaged in by Microsoft in fact caused the damage Novell claims it suffered.

Against the background of these rules and principles, you are being asked to answer certain questions. The questions are set forth on the special verdict form that Theresa will now hand to you.

The first two questions relate to the issue of causation about which I just instructed you. First, question 1 asks "has Novell proven by a preponderance of the evidence that Microsoft's decision to

withdraw support for the namespace extension APIs caused Novell's productivity applications (WordPerfect, Quattro Pro, and PerfectOffice) to be late to market?" As indicated on the verdict form, if you answer this question "no," you should not answer the remaining questions on the form. If you answer question 1 "yes," the second question is "has Novell proven by a preponderance of the evidence that, but for Microsoft's decision to withdraw support for the namespace extension APIs, Novell's productivity applications (WordPerfect, Quattro Pro, and PerfectOffice), would have been released to the market either about the time that Windows 95 was released (August 24, 1995), or within a sufficiently short time period thereafter to take advantage of the release?" Again, as indicated on the verdict form, if your answer to this question is "no," you should not answer the remaining questions on the form.

Questions 3, 4, and 5 relate to the anticompetitive conduct that Novell alleges Microsoft engaged in. Question 3 is "has Novell proven by a preponderance of the evidence that Microsoft engaged in anticompetitive conduct by the decision to withdraw support for the namespace extension APIs?" If your answer to this question is "no," you should not answer the remaining questions on the verdict form.

You are being asked to answer questions 4 and 5 because of uncertainties I believe exist in antitrust law, and your answers to them may clarify the record and prevent a retrial of this case. These questions are important because they are related to an element of Novell's claim that Novell must prove. On the one hand, it may be that Novell must prove that (1) the anticompetitive conduct it alleges was engaged in by Microsoft in fact caused the damage that Novell claims it suffered, and (2) that the same conduct that damaged WordPerfect, Quattro Pro, and PerfectOffice also harmed competition in the PC operating system market and significantly contributed to the maintenance of Microsoft's monopoly in that market. On the other hand, it may be that Novell must prove that (1) the anticompetitive conduct it alleges was engaged in by Microsoft in fact caused the damage that Novell claims it suffered, and (2) the same conduct that damaged WordPerfect, Quattro Pro, and PerfectOffice was reasonably capable of significantly contributing to the maintenance of Microsoft's monopoly in the operating system market. Questions 4 and 5 reflect these rules of law.

You should not answer either question 4 or 5 unless you have answered questions 1, 2, and 3 "yes." Question 4 is "has Novell proven by a preponderance of the evidence that the delay caused to Novell by Microsoft's decision to withdraw support for the namespace extension APIs caused harm to competition in the market for PC operating systems and contributed significantly to the maintenance of Microsoft's monopoly in that market?" You should answer question 5 regardless of how you have answered question 4. Question 5 is "has Novell proven by a preponderance of the evidence that Microsoft's withdrawal of support for the namespace extension APIs was reasonably capable of contributing significantly to the maintenance of Microsoft's monopoly in the market of PC operating systems? By asking the questions in two forms, I am not suggesting that your answers should be different. They may or may not be.

You should not answer questions 6 or 7 unless you have answered either or both question 4 and question 5 "yes." Questions 6 and 7 ask you to identify the specific claims asserted by Novell that you find to be meritorious: the "popular applications" claim and the "middleware" claim. You should answer questions 6 and 7 only if you have answered questions 1, 2, and 3 "yes" and, as I just indicated, either or both questions 4 or 5 "yes." Question 6 asks if your "yes" answer to questions 4 or 5 is based upon Novell's claim that WordPerfect, Quattro Pro, and/or Perfect Office offered competing operating systems the prospect of lowering the applications barrier to entry because a competing operating system, running the Novell applications, would offer consumers an attractive alternative to Windows. Question 7 asks if your "yes" answer to questions 4 or 5 is based upon Novell's claim that WordPerfect, Quattro Pro, and/or Perfect Office constituted a "middleware" threat to Microsoft's monopoly in the PC operating system market.

You should not answer question 8 unless you have answered either or both question 6 and question 7 "yes." Question 8 relates to the question of damages. If you have answered "yes" to questions 1, 2, and 3, and "yes" to either question 4 or question 5, you should answer question 8. Therefore, I will now instruct you on issues concerning damages. However, the fact that I am doing so should not be

considered as indicating any view of mine as to which party is entitled to your verdict. Instructions on the measure of damages are given only for your guidance in the event that you should find in favor of Novell on the questions I have outlined and in accordance with the other instructions I have given.

If you find by a preponderance of the evidence that Microsoft violated the antitrust laws and that this violation caused injury to Novell, then you must determine the amount of damages, if any, Novell is entitled to recover. The law provides that Novell should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful. The purpose of awarding damages in an antitrust action is to put an injured party as nearly as possible in the position in which it would have been if the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer — what we sometimes refer to as punitive damages — or to deter a monopolist from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. You are also not permitted to award to Novell an amount for attorneys' fees or the costs of maintaining this lawsuit. Antitrust damages are compensatory only. In other words, they are designed to compensate Novell for the particular injury it claims to have suffered as a result of the anticompetitive conduct engaged in by Microsoft.

You are permitted to make reasonable estimates in calculating damages. It may be difficult for you to determine the precise amount of damages Novell suffered. If Novell has established with reasonable probability the existence of injury proximately caused by Microsoft's decision to withdraw support for the namespace extension APIs, then you are permitted to make a just and reasonable estimate of the damages. So long as there is a reasonable basis in the evidence for a damages award, Novell should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates supported by the evidence.

If you find that Novell's alleged injury was caused in part by Microsoft's decision to withdraw support for the namespace extension APIs, then you may award damages only for that portion of Novell's

alleged injury that was caused by Microsoft's conduct. Novell's burden of proving damages with reasonable certainty includes the burden of apportioning damages between the injury to Novell that was caused by Microsoft's decision to withdraw support for the namespace extension APIs and any harm Novell may have suffered as a result of other factors.

In sum, an award of damages may not be based on guesswork or speculation. If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages.

## PART THREE

I have now reached the third part of my instructions relating to the mechanics and procedure of your deliberations.

When you retire to the jury room, you will select one of yourselves to act as your foreperson. The foreperson will preside over your deliberations and be your spokesperson here in Court. When you have reached a unanimous verdict, please notify the bailiff. You will then return to the Courtroom and ~~Mr./~~Ms *Thinsew*, after taking roll call, will take your verdict.

If it becomes necessary during your deliberations to communicate with me, you may send a note by a bailiff, signed by your foreperson, or by one or more members of the jury. No member of the jury should ever attempt to communicate with me by any means other than a signed writing; and I will never communicate with any member of the jury on any subject touching the merits of the case, otherwise than in writing, or orally here in open Court.

You will note from the oath about to be taken by the bailiff that he too, as well as all other persons, is forbidden to communicate in any way or manner with any members of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person - not even to the Court - how the jury stands, numerically or otherwise, on the issues to be decided, until after you have reached an unanimous verdict.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you

must decide the case for himself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are not partisans. You are judges - judges of the facts.